IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America | : | |
| | : | Case No. CR-1-07-129 |
| | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER DENYING |
| Jason Washington | : | DEFENDANT'S MOTION TO |
| | : | SUPPRESS |
| Defendant | : | |

This matter comes before the Court on Defendant Jason Washington's Motion to Suppress.  (Doc. 18.)  The Court held a hearing on the motion on December 7, 2007.  The matter is now ripe for review.  For the reasons that follow, the Court **DENIES** Defendant's motion.

**I.      FACTUAL BACKGROUND**

Defendant Jason Washington was arrested on October 6, 2005 following an incident that occurred when probation officers performed a home check at Washington's residence.  Following his arrest, officers searched Washington's home, finding crack cocaine and powder cocaine along with five guns and $1405.00 in cash.  Washington contends that the search violated his Fourth Amendment rights and moves to suppress the seized evidence as well as any statements he made to the police.

At the time of his arrest, Jason Washington was on house arrest with electronic monitoring and was staying at his father Alex Washington's house in Cincinnati, Ohio.  Defendant Washington had been on house arrest since September 7, 2005 as a result of an

unrelated arrest and conviction for carrying a concealed weapon. As a condition of his probation, Washington was required to remain in his home except for work or unless he obtained prior approval from his probation officer. This and other terms of his probation, such as a prohibition against the "[u]se of, or possession of, any alcohol or unlawful drug," were included in Washington's Electronic Monitoring Unit (EMU) agreement.[1] (Doc. 19, Ex. 1 at 2 ¶ 7.)

Pursuant to the EMU agreement, Washington consented to "allow an EMU Officer to enter [his] home for inspection purposes." (Id., Ex 1 at 2 ¶ 2.) Additionally, in a separate portion of the agreement, titled the "Home Owner Agreement," both Jason and Alex Washington agreed to "allow a probation officer or EMU staff to enter [their] home for inspection purposes and to check the monitoring equipment." (Id., Ex. 1 at 1.) As to the meaning of "inspection purposes" as it appears in the EMU agreement, both officers testified that they understood the agreement to put the homeowner on notice that the home is subject to a plain view inspection. As a result, the agreement effectively gave the officers permission to enter the home and perform a plain view sweep of the premises.

The EMU used to monitor Washington's presence consisted of a transmitter, which was secured to Washington's ankle, and a receiver, which was connected to the phone line at Washington's residence through a telephone cord. Washington's EMU was set up so as to provide him with a range of motion of seventy-five feet in any direction from the receiver. In the event that Washington left that seventy-five foot range without prior permission, the receiver alerted that he was out of range and transmitted this information to the Hamilton County Probation Office and to Washington's probation officer. While under electronic monitoring,

---

[1] Washington signed the EMU agreement on September 7, 2005.

Washington was prohibited from using call forwarding, call waiting, an answering machine, a cordless phone, or any other system or device that may be used to manipulate the EMU to provide a broader range of motion than legally permitted.

The Hamilton County Probation Department was in charge of monitoring Washington's behavior, including his compliance with the monitoring program. Defendant Washington was specifically assigned to Probation Officer Edward Schinkal. On October 6, 2005, Officer Schinkal was on duty and working in the field with another probation officer, Bryan Hale.[2] At or around 7:00 p.m., Officer Schinkal received a page alerting him that Washington had committed a curfew violation and was outside the range of his electronic monitoring system. The EMU Daily Summary[3] shows that Washington was out of range for approximately ten minutes. After receiving notification of the curfew violation, Officer Schinkal called Washington's residence and spoke with the Defendant, confirming that he had returned to the house. Washington stated that he was outside hanging out with friends.

The officers decided to stop by Washington's residence to do a visual inspection. According to Officer Hale, he and the other probation officers do not always respond in person after receiving notification that an individual is out of range. However, because Officers Hale and Schinkal were already working in the area close to Washington's residence, they decided to do a visual inspection to further investigate Washington's stated reason for being out of range. They arrived at the house at approximately 8:00 p.m. Both officers testified that they had never

---

[2] Both officers were, at that time, in the Electronic Monitoring Division.

[3] The Daily Summary, submitted by the Government as Exhibit 4 during the suppression hearing, is a record of all electronic contact with the monitoring unit. For example, it notes such events as unsuccessful calls to the assigned phone line and periods during which the transmitter is out of range.

been to Washington's house for an inspection before. According to the officers, when they knocked on the door, a black male who they identified as someone other than Jason Washington answered the door and told them that Defendant Washington was in his bedroom. Once in the living room, the officers smelled marijuana and noticed the butt of a marijuana cigarette, which they referred to as a "cocktail," in the ashtray on the coffee table. The also saw money and the ripped off tops of small plastic bags[4] lying in plain view on the coffee table, along with a picture of Jason Washington holding a wad of bills. The officers inferred from the fact that the picture showed Washington wearing his EMU transmitter that the photograph had been taken recently.

Officer Schinkal then went to look for Jason Washington in his bedroom while Officer Hale remained near the living room. Washington was not in his bedroom. Instead, there was an unidentified woman in the room who informed Officer Schinkal that Washington was in the basement. Both officers then went to the basement door and saw Washington standing in the dark basement. After the officers asked him what he was doing, Washington claims he was coming in from the garage and walked up the stairs.

The officers then returned to the living room with Washington and began questioning him. According to the officers, when they asked if there was anything illegal in the house, Washington answered "no" but appeared nervous. At some point the other young male who had opened the door for the officers claimed that the marijuana cocktail was his and that he had been smoking in the living room. Officer Hale testified that while questioning Washington in the living room, he asked Washington if he had any problem with the officers looking around the

---

[4] Officer Hale testified that in his experience, people often stored drugs in plastic bags and ripped the tops of the bags off. Therefore, he believed the torn off tops of the bags to indicate the presence of illegal drugs.

house. According to Officer Hale, Washington then gave them verbal consent to search the house. The officers also testified that they spoke with Alex Washington, the owner of the house, and claimed that he gave them verbal consent to search the house and stated that he was unaware of anything illegal in the house.

After getting consent, the officers began their search in the basement where they had just found Defendant Washington. At the bottom of the steps, the officers found a shoe box containing ammunition. Washington claimed that the ammunition must have been left over from his previous weapon charge. When the officers scanned the basement, one of the first things they noticed was a chair that appeared to be misplaced. As opposed to the other chairs that were placed around a table, the suspicious chair was placed in the middle of the room beneath a ceiling tile and seemed to be facing an odd direction. Additionally, both officers recalled seeing a footprint on the chair, though their descriptions of the chair and footprint were somewhat different. Officer Hale testified that there appeared to be dust on the chair from a ceiling tile and that the outline of the footprint was visible in that dust. He also claimed that there was an "imprint" in the chair. Like Officer Hale, Officer Schinkal also recalled seeing a footprint in what appeared to be dust on the chair. However, he described the chair as being wood, without any type of cushion, thereby making it unlikely that a foot could have left a physical "imprint" on the seat of the chair.

As Officer Hale approached the chair Washington grew increasingly nervous and started slowly backing away. Officer Hale stepped onto the chair and pushed on the ceiling tile to see if there was anything above it. This prompted Washington to take off running. Both officers abandoned the search and chased Washington as he ran out of the house and over to a neighbor's

house. Further escalating the situation, Washington barricaded himself in the neighbor's house, where a babysitter was watching the neighbor's three small children. The babysitter escaped shortly after Washington entered the home, leaving the children behind.

Shortly thereafter backup arrived to deal with the possible hostage situation, and Officer Schinkal returned to Washington's residence to secure the scene. Meanwhile, Officer Hale and two other officers formed an entry team and entered the neighbor's home from the north and south entrances, securing the house room by room. Eventually, the officers located Washington in the basement, arrested him, and gave him a verbal <u>Miranda</u> warning.[5] Sometime thereafter, Jason Washington provided a written statement. (Doc. 19, Ex. 3.)

In the meantime, two other officers, Jonathon Gordon[6] and Colleen Deegan, had arrived at Washington's residence. While Jason Washington was barricaded in the neighbor's house, Officers Gordon and Deegan sought written permission from Alex Washington to search the house. Officer Deegan presented Alex Washington with a written consent to search form[7] and

---

[5] While testifying, Officer Hale stated that after reading Jason Washington his rights, he asked Washington why he ran. However, Officer Hale could not recall whether Washington made any statements at that time.

[6] At the suppression hearing, Officer Gordon testified regarding the written consent to search that the officers obtained from Alex Washington. At the time of the incident, Officer Gordon was assigned to the Street Corner unit and was working undercover. He was called to the scene, in part, because of his experience in dealing with illegal substances.

[7] The "Consent to Search Without a Warrant" form signed by Alex Washington states the following:

> I, Alex Washington, having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to such a search, hereby authorize members of the Cincinnati Police Division and/or its agents to conduct a search of 6582 Daly Rd. These officers are authorized by me to take from my above-listed house at 6582 Daly Rd. [Cincinnati,] OH 45224, of which I am the lawful occupant, any letters, papers,

read the form to Washington while in Officer Gordon's presence. According to Officer Gordon, Alex Washington signed the form, thereby voluntarily consenting to the search of his home. Shortly thereafter, Officer Gordon and other officers searched the house. Officer Schinkal returned to the basement and retrieved two bags from above the ceiling tiles where he and Officer Hale had attempted to search before Jason Washington took off running.[8] Other officers searched the remainder of the residence. The two bags hidden in the ceiling contained approximately 120 grams of cocaine, cash, and two semi-automatic handguns. The officers also recovered four bags of crack-cocaine from a duffle bag that was hidden in the laundry room in the basement and at least three more firearms.

In addition to Officers Hale, Schinkal, and Gordon, Alex Washington also testified as to the circumstances of Jason Washington's arrest and the search of their home. Alex Washington's account of the events differed in several aspects from that of the officers. First, Alex Washington testified that the officers had, in fact, been to his home before for inspections. Additionally, Alex Washington denied giving the officers permission to search his home.

Consistent with the officers' testimony, Alex Washington claimed that he had arrived home about thirty minutes before Officers Hale and Schinkal arrived at his residence. According

---

        materials, or other property which is contraband, or may be used as evidence in a criminal or civil proceeding.

        This written permission is being given by me to members of the Cincinnati Police Division and/or its agents voluntarily and without threats or promises of any kind.

(Doc. 19, Ex. 2.)

[8] It is unclear whether Officer Schinkal waited for Officer Gordon to get Alex Washington's written consent before retrieving the bags from the ceiling. Officer Schinkal's official report suggests that he proceeded with the search independent of Officer Gordon's attempt to solicit written consent from Alex Washington. (Def. Ex. B at 1.)

to Alex, Jason's friend was sitting in the living room and Jason was in his bedroom. Alex went back into his bedroom and did not emerge until after the officers entered the house. Alex Washington then claimed that when the officers asked permission to search the house, he responded that he did not see a need for a search, but that they could ask Jason. According to Alex, when the officers asked Jason for consent to search, Jason said no. Based on Jason's response, Alex then denied consent as well and returned to his room where he remained until he heard Jason running up the basement stairs with the officers running close behind.

Shortly thereafter, other officers arrived at the house and, according to Washington, placed him in handcuffs. Washington testified that he remained handcuffed for quite a while and indicated that he was still handcuffed when Officers Gordon and Deegan approached him and again asked for consent to search the house.[9] Washington testified that the officers told him that if he did not sign the consent form, they would get a warrant and tear the whole place up. Therefore, though Washington admitted to signing the form, which expressly states that "[t]his written permission is being given . . . voluntarily and without threats or promises of any kind," he claimed that his consent was in fact coerced. (See doc. 19, Ex. 2.) He further claimed that as a result of the coercion, the female officer refused to sign the form as a witness.

Following the search, Jason Washington was transmitted to the police station. At that time, Officer Gordon gave Jason Washington a written notification of rights containing a standard <u>Miranda</u> warning. (<u>See</u> doc. 19, Ex. 3.) After determining Washington's level of education, a high school G.E.D., Officer Gordon read the notification of rights aloud. Jason

---

[9] Officer Gordon claimed he could not remember Alex Washington being in handcuffs at any time.

Washington signed the form, indicating that he understood his rights, and provided a written statement on the back of the form. Defendant Jason Washington now moves to suppress that statement along with the drugs and weapons seized during the search of his house.

## II.     ANALYSIS

Defendant Washington argues that the officers exceeded the bounds of the Fourth Amendment by entering and conducting a search of his residence without probable cause to do so and without first obtaining a warrant or valid consent.  The Government responds that the officers had both probable cause and consent to search Washington's residence, placing the search squarely within the limits of the Fourth Amendment.

The Fourth Amendment guarantees the right to be free from unlawful searches and seizures: "The right of the people to be secure in their persons, houses and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.  Above all, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585 (1980).  Therefore, the Supreme Court has time and again held that warrantless searches and seizures inside a home are presumptively unreasonable. See id. at 586.

There are, however, limited exceptions to the warrant requirement in this context, such as where consent is obtained prior to the search. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to

consent."); Shamaeizadeh v. Cunigan, 338 F.3d 535, 547 (6th Cir. 2003). In determining the reasonableness of the search, the Court analyzes the officers' actions in steps, beginning with their warrantless entry into Washington's home, to determine if either or both of these exceptions apply.

### A. Officers Hale and Schinkal's Entry into Defendant's Residence

Defendant first objects to Officers Hale and Schinkal's warrantless entry into his residence. The Government responds that the officers' entry into the home was explicitly authorized under the EMU agreement and therefore did not violate the Fourth Amendment.

The ten-minute period during which Washington was outside the range of the EMU constituted a violation of the terms of his supervised release. According to Officer Hale, officers have discretion to handle that type of violation in a variety of ways, from arresting the probationer to giving him a warning or restricting the hours within which he is permitted to leave home. Generally, Officer Hale testified, the officers try to assess the situation and the reason for the violation before determining the appropriate course of action. In this case, because the officers were already in the area of Washington's home, they decided to perform a home inspection to further investigate the reason for Washington's violation.[10]

---

[10] Defendant argues that the officers had no need to perform a home inspection because Officer Schinkal was able to speak to Defendant on the telephone to confirm that he had returned to his residence and to ascertain the reason that he had been out of range. In doing so, Defendant suggests that the officers were bound to accept Defendant's explanation that he was out of range because he was visiting friends and that it was therefore unreasonable for the officers to continue to investigate the violation. The Court finds this position untenable. The officers have a certain amount of discretion in determining how to investigate probation violations and need not always take the probationer at his word.

Defendant does not dispute that the EMU agreement gives the officers authority to enter his residence for the purpose of inspection. However, Defendant claims that the scope of permissible inspection is limited to an inspection of the EMU equipment itself, such that the officers may maintain the unit and ensure that no one has modified or tampered with it. The Court, therefore, must determine the scope and enforceability of the inspection authorization contained in the EMU agreement.

In Griffin v. Wisconsin, 483 U.S. 868, 873 (1987), the Supreme Court noted that "[a] probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" With this in mind, the Griffin Court nonetheless recognized that under certain circumstances, such as those attendant to the realities of probation, courts "have permitted exceptions when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" Id. (quoting New Jersey v. T.L.O., 469 U.S. 325, 351 (1985)).[11] Accordingly, where officers conduct a warrantless entry and search of a probationer's home based on a statute or regulation granting them expanded authority, courts must apply a modified Fourth Amendment analysis. First, courts must determine whether

---

[11] Regarding the nature of probation, the Supreme Court noted:

> These restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large. These same goals require and justify the exercise of supervision to assure that the restrictions are in fact observed. Recent research suggests that more intensive supervision can reduce recidivism, and the importance of supervision has grown as probation has become an increasingly common sentence for those convicted of serious crimes. Supervision, then, is a "special need" of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large. That permissible degree is not unlimited, however . . .

Id. at 875 (internal citations omitted).

the regulation in question is reasonable under the Fourth Amendment. United States v. Henry, 429 F.3d 603, 608 (6th Cir. 2005). In determining whether the special needs of the probation system justify the search regulation, the Court is to "take that regulation as it has been interpreted by state corrections officials and state courts." Griffin, 483 U.S. at 875. Next, the Court must determine whether the search occurred within the parameters of the regulation. Henry, 429 F.3d at 608.

Based on those standards, the appropriate focus of the Court's analysis is Defendant's EMU agreement, which states explicitly that as a condition of Defendant's participation in the electronic monitoring program, Defendant must agree to "allow a probation officer or EMU staff to enter [his] home for inspection purposes and to check the monitoring equipment." (Doc. 19, Ex. 1 at 1.) Both Alex and Jason Washington voluntarily consented to this term by signing the EMU agreement, and neither alleged that their consent was involuntary. At the suppression hearing, Officers Hale and Schinkal testified that they interpreted this clause to permit them to enter Washington's house and perform a plain view inspection. In light of the fact that courts have previously found other, similarly if not more invasive regulations to be reasonable under the Fourth Amendment, the Court concludes the search clause at issue in this case to be reasonable. See Henry, 429 F.3d at 609 (finding that a Kentucky policy allowing an officer to "conduct a warrantless search if he has reasonable suspicion that the performance of the search may produce evidence to support [an alleged violation of Appellant's parole]" was reasonable).

Indeed, Defendant Washington does not argue that the disputed clause is unreasonable. Instead, focusing mainly on the second prong of the test, Defendant argues that by entering his home for a purpose other than to inspect the electronic monitoring equipment, Officers Schinkal

12

and Hale exceeded the scope of the agreement. Washington suggests that the agreement be narrowly interpreted to mean that an officer may enter only to inspect the equipment. However, Defendant's position does not account for the fact that the clause separately grants permission for the officers to enter "for inspection purposes *and* to check the monitoring equipment." (Doc. 19, Ex. 1 (emphasis added).) Such language plainly indicates that "inspection purposes" encompasses some other purpose than to "check the monitoring equipment." Therefore, Officer Hale's and Officer Schinkal's initial entry into and plain view sweep of the residence was authorized by the EMU agreement and did not exceed the bounds of the Fourth Amendment.

    **B.**  **The Warrantless Search of Defendant Washington's Home**

  The EMU agreement, as Officers Hale and Schinkal testified, authorized at most a plain view inspection of Washington's home. Officer Hale exceeded the scope of that authority when he attempted to search above the ceiling tiles in Washington's basement by standing on a chair and pushing up on the ceiling tile to feel if there was anything above it. To justify the officers' failure to obtain a warrant prior to conducting this search, the Government relies on two exceptions to the warrant requirement. First, the Government argues for the application of the relaxed Fourth Amendment exception for probationers established in United States v. Knights, 534 U.S. 112 (2001). Next, the Government contends that the officers obtained valid consent prior to the search.

    **1.**  **Relaxed Standard for the Search of a Probationer's Home**

  In Knights, 534 U.S. at 112, the Supreme Court articulated a relaxed standard applicable to the search of a probationer's home under circumstances wherein the probationer is found to have a diminished expectation of privacy such that the usual Fourth Amendment protections are

not applicable. In that case, the Supreme Court found that a warrantless search of a probationer's residence was justified based on reasonable suspicion alone where the probationer had already agreed to "[s]ubmit his ... person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer," as a condition of his probation. Id. at 114, 121-22. In reaching that decision the Supreme Court noted the following:

> When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.
>
> The same circumstances that lead us to conclude that reasonable suspicion is constitutionally sufficient also render a warrant requirement unnecessary.

Id. at 121.

To the extent that the Government reads the Supreme Court's decision in Knights to pronounce a relaxed standard applicable in all cases involving a probationer's Fourth Amendment rights, the Sixth Circuit has squarely rejected that reading of Knights in a case involving the warrantless search of a parolee's girlfriend's residence. United States v. Carnes, 309 F.3d 950, 962-63 (6th Cir. 2002). After finding that the parolee defendant, Carnes, had standing to challenge the search, the Sixth Circuit addressed the government's contention that because Carnes was a parolee, he had a diminished expectation of privacy and the warrantless search did not violate the Fourth Amendment. In rejecting this contention, the Sixth Circuit emphasized that the Knights Court's ruling was influenced not only by the defendant's status as a probationer, but also by the terms of the defendant's probation agreement:

> Paying particular attention to the facts of Knights's case, the Court rejected the proposition that the government can search all probationers and parolees without

> a warrant and probable cause. Rather, the Court described Knights's own probation search condition as a "salient circumstance" affecting the "balance of [the] considerations [which] require[d] no more than reasonable suspicion to conduct a search of this probationer's house." Additionally, such a categorical rule permitting any search of a probationer or parolee, with or without a warrant or probable cause, would have made the special needs analysis of Griffin completely unnecessary.
>
> Therefore, we look to the facts specific to this case in determining whether Carnes had a diminished expectation of privacy, "assessing, on the one hand, the degree to which [a search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."

Carnes, 309 F.3d at 961 (internal citations omitted). The Sixth Circuit then found that Carnes's parole agreement was "wholly different from Knights's probation search condition" and that "[u]nlike Knights's agreement, nothing in Carnes's agreement shows that he would expect the police to be able to search him without probable cause or a warrant." Id. at 962. Therefore, the court held that a warrant and probable cause was necessary to conduct the search of Carnes's girlfriend's residence.

The same is true in the instant case. The search authorization in Knights is fundamentally different from and grants much broader authority than the inspection provision included in Defendant Washington's EMU agreement. Washington's EMU agreement does not permit officers to conduct a full warrantless search of Washington's residence based on reasonable suspicion of criminal activity. Instead, as the Court has already found, it allows only a plain view sweep of the premises. Nor has the Government pointed to any state law or regulation granting officers greater authority to search a probationer's house, such as would justify a finding that Defendant Washington's expectation of privacy in his home was so diminished as to do away with the warrant requirement.

**2. Consent**

The Government next seeks to justify the search of Washington's home on the basis of consent. "Consent from an individual whose property is to be searched or from a third party who possesses common authority over the premises validates a search that would otherwise be considered unreasonable and unconstitutional." Shamaeizadeh, 338 F.3d at 547. Consent may be in the form of words, gestures, or conduct. United States v. Carter, 378 F.3d 584, 587 (6th Cir. 2004). "When seeking to justify a search based on consent, the government has the burden of showing by a preponderance of the evidence that the consent was 'freely and voluntarily given,' and was not the result of coercion, duress, or submission to a claim of authority." United States v. Bueno, 21 F.3d 120, 126 (6th Cir. 1994) (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). The determination of whether consent was entered into freely and voluntarily is "a question of fact to be determined from the totality of all the circumstances." Schneckloth, 412 U.S. at 227.

After reviewing the evidence in this case, the Court finds that the Government has shown by a preponderance of the evidence that Officers Hale and Schinkal obtained verbal consent from both Jason and Alex Washington prior to searching Defendant Washington's house. Officer Hale testified that the officers obtained Jason Washington's consent while talking with him in the living room. According to Officer Hale, he questioned Washington as to whether there was anything illegal in the house and Washington repeatedly responded "no." Then, Officer Hale asked Jason Washington if he had any problem with the officers looking around and, according to Officer Hale, Washington responded, "No, there's nothing here." At that point, Officer Hale asked who owned the house and Jason Washington responded that his father

was the owner. Officer Hale located Alex Washington and asked him if there was anything illegal in the house. Alex Washington responded that if there was anything illegal, it did not belong to him. Officer Hale then asked Alex Washington for permission to search the house and obtained verbal consent. Additionally, Officer Hale claimed that to ensure that he and Officer Schinkal obtained proper consent, he asked Jason Washington again, after getting consent from Alex Washington, whether Jason was okay with the officers looking around and Jason Washington responded that he was okay with that.

Officer Schinkal's testimony corroborated Officer Hale's description of the events. As to Alex Washington, Officer Schinkal testified that when he walked into the living room, the officers asked him for permission to search the house, and Alex Washington replied, "I don't care, go ahead and search; but if you find any drugs here, they ain't mine." (See also Official Report of Officer Schinkal, Def. Ex. B at 2.) Then, according to Officer Schinkal, the officers asked Jason Washington for consent and he also gave verbal consent.

Though Alex Washington denied having given consent, the Court does not find his testimony to be credible. Instead, the Court finds that on balance, the greater weight of the evidence demonstrates that both Jason and Alex Washington consented to a search of their house, thereby excusing the Fourth Amendment's requirement that the officers demonstrate probable cause and obtain a warrant prior to conducting the search.

### III. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant Washington's motion to suppress. The evidence seized during the search of Washington's home and the statement that Washington gave following that search are admissible.

IT IS SO ORDERED.

                                            S/Susan J. Dlott
                                            Susan J. Dlott
                                            United States District Judge